UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                    Case No. 20-cr-268 (JRT/LIB)

        Plaintiff,

v.                                           **REPORT AND RECOMMENDATION**

Brandon Robert Harkins,

        Defendant.

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636 and Local Rule 72.1, upon Defendant Brandon Harkins' ("Defendant") Motion to Suppress Statements, Admissions, and Answers. [Docket No. 19]. The Court held a Motions Hearing on June 23, 2021, regarding the parties' pretrial motions.[1]

At the Motions Hearing, the parties requested, and were granted, the opportunity to submit supplemental briefing. Upon the completion of that briefing, Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 19], was taken under advisement.

For reasons discussed herein, the undersigned recommends that Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 19], be **DENIED**.

## I.    Background and Statement of Facts

### A.  Background

Defendant is charged with one (1) count of receipt of child pornography in violation of 18 U.S.C. §§ 2252 (a)(2) and 2252 (b)(1), three (3) counts of distribution of child pornography in

---

[1] At the June 23, 2021, Motions Hearing, Defendant withdrew his Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 18]. (Tr. 5).  The parties' pretrial motions for discovery and production of evidence were addressed by the Court in a separate Order. [Docket No. 51].

violation of 18 U.S.C. §§ 2252(a)(2) and 2252 (b)(1), as well as, one (1) count of possession of child pornography in violation of 18 U.S.C. §§ 2252(a)(4)(B) and 2252(b)(2). (Indictment [Docket No. 1]).

### B. Facts[2]

The record presently before the Court indicates that, on May 21, 2019, at approximately 9:00 a.m., Special Agent Timothy Ball ("SA Ball") arrived at Defendant's residence (hereinafter, the "Residence") to execute a search warrant and seize electronic devices allegedly containing suspected images of child pornography. (Tr. 17-18). SA Ball, who was dressed in plainclothes, was accompanied by a uniformed East Range Police Officer, while the rest of the search team remained at the end of the drive. (Id. at 19). SA Ball knocked on the door, and a couple of minutes later, Defendant opened the door. (Id. at 18, 20). SA Ball advised Defendant that he had a search warrant for the Residence, and without making physical contact, Defendant was then directed into the living room where he sat on the couch. (Id. at 20). The rest of the search team entered the Residence to conduct a protective sweep and to take photographs. (Id. at 20, 39, 42). The Residence was then searched, which included the garage and a shed. (Tr. at 42).

Approximately thirty minutes later, SA Ball asked Defendant to speak with him, and Defendant agreed. (Id. at 20-21, 41). SA Ball and Defendant then went into the kitchen and sat at the kitchen table along with Sheriff's Office Investigator Steven Heinreich ("Inv. Heinreich"). (Id. at 21, 23-24). In addition to the table, the kitchen contained a stove, a refrigerator, and appliances on top of a wooden stand against a back wall.[3] (Gov't Ex. 2; Tr. 25-26). The kitchen

---

[2] The facts contained in this section are derived from the testimony of Special Agent Timothy Ball (hereinafter "SA Ball") with the Federal Bureau of Investigation at the June 23, 2021, Motions Hearing, as well as, the Government's exhibits presented in the present case.

[3] Government's Exhibit 2 is a photograph of the kitchen in Defendant's residence, which was initially included in Defendant's Motion to Suppress Statements, Admissions, and Answers. [Docket No. 19]. At the Motions Hearing, the Government, without objection, offered the photograph as Government's Exhibit 2. (Tr. 25).

had a window and two exits: one that led into the living room and to the front door, and another that led out to the garage. (Id.). SA Ball and Inv. Heinreich sat on the side of the kitchen table closet to the stove, and Defendant sat on the opposite side of the table closest to the back wall. (Tr. 26).

SA Ball placed the digital recorder on the table and began immediately recording the conversation. (Gov't's Ex.1).[4] SA Ball began the interview by identifying himself, Inv. Heinreich, and Defendant, providing the address of the Residence, and providing the approximate time as 9:27 a.m. (Id. at 00:00-00:23). SA Ball then, just as he had informed Defendant earlier at the front door, stated he had a warrant to search the residence; that Defendant was not under arrest; that Defendant was not going to be arrested that day; and that SA Ball would like to sit down and speak to Defendant. (Id. at 00:24-00:58). Defendant can be heard responding, "Yes." (Id.). SA Ball stated that the search warrant allowed law enforcement to search the Residence and Defendant's vehicle, "just to see if [Defendant] ha[d] any cell phones . . . any electronic devices." (Id. at 00:58-00:59).

SA Ball then stated, "You don't have to talk to me, you don't have to answer any of my questions"; "If you want to start answering them you can, and if you get to a point where you say, you know what, I don't want to answer anymore questions, that's your right, you're not going to offend us." (Gov't's Ex. 1, at 00:59-01:25). SA Ball then asked Defendant, "You understand all that, right, you don't have to talk to me," to which Defendant responded, "Yes." (Id. at 01:25-01:35). SA Ball continued further assuring Defendant that he could answer some questions, but could stop answering if he changed his mind, to which Defendant agreed that was fair. (Id. at

---

[4] Government's Exhibit 1 is a thumb drive containing the audio recording of the May 21, 2019, and August 1, 2019, interviews of Defendant at his residence. At the Motions Hearing, the Government, without objection, offered the thumb drive audio recordings into evidence as Government's Exhibit 1. (Tr. 16). The citations to the audio recordings are in a MM:SS format.

01:35-01:52). SA Ball testified at the June 23, 2021, Motions Hearing that he commonly gives these warnings or disclaimers to everyone he interviews so that the individual understands that he or she is under no obligation to answer SA Ball's questions. (Tr. 23).

SA Ball then stated the reason law enforcement was in his home with a search warrant and why he wanted to talk to Defendant concerning several electronic downloads traced back to the Residence. (Gov't Ex. 1, at 01:52-04:03). Defendant agreed by responding, "Yes." SA Ball told Defendant "we would like to get your side of the story," because law enforcement "has one side . . . they did the downloads that brought them to this residence." (Id. at 04:03-04:32). SA Ball continued to inform Defendant that he was under no obligation to speak to SA Ball and that he was not going to be arrested that day; to which Defendant again responded, "Yes." (Id. at 04:03-05:16).

SA Ball then advised Defendant that, if he chose to speak with SA Ball, Defendant would need to tell the truth because it is a violation of federal law to lie to a federal agent and he could potentially be charged with a crime; Defendant acknowledged that he understood. (Tr. 23; Gov't Ex. 1, at 05:16-05:52). After asking Defendant if he would like to answer some of SA Ball's questions, Defendant responded, "I'm . . . not sure how to . . . my anxiety was pretty difficult before and I'm having trouble putting my. . . words together." (Gov't Ex. 1, at 05:52-06:39). SA Ball then continued speaking to Defendant assuring him that he was not trying to pressure Defendant; that SA Ball knew "a lot"; and asking, "Where are you leaning? Want to tell us what's going on?" (Id. at 06:39-07:42). SA Ball continued speaking to Defendant asking him "if [he has] heard of the old adage the truth shall set you free?" and "That's a heavy weight to be carrying on your shoulders, isn't it?" (Id. at 07:42-08:05).

SA Ball continued assuring Defendant that he did not have an obligation to speak to him, that it was his right, and that it would not offend SA Ball if Defendant chose not to speak. (Id. at 10:48-11:26).

SA Ball then inquired whether Defendant's phone had a password and Inv. Heinreich can be heard telling Defendant, "You look like you have a lot weighing on your shoulders right now." (Id. at 11:26-12:02). Defendant then stated, once more, that he was having trouble putting his words together. (Gov't Ex. 1 at 12:02-12:29).

SA Ball can next be heard over the course of the conversation telling Defendant that he would like to hear Defendant's side; that talking about it would take the weight off of his shoulders; and that SA Ball is not going to tell Defendant's girlfriend what he shares. (Id. at 12:29-16:59, 18:00-19:40). SA Ball also informed Defendant of the procedure once the evidence gets collected from Defendant's home, and Defendant was offered a glass of water because "it's [his home], [he's] not under arrest." (Id. at 12:29-16:59, 24:20-25:00, 42:40-44:06). Defendant responded to SA Ball that he was "having a hard time thinking right now," "I'm sorry, I'm having a hard time following," and he was "having a hard time formulating words" because of his anxiety. (Id. at 16:59-17:40, 20:38). Defendant also stated that he had been stressed lately and slipping in his mental health finding himself isolating more, staying up later, and losing track of time; that he was really scared of the repercussions if he relapsed; and that he was on social security for depression and anxiety. (Id. at 20:35-24:20, 25:24-26:35, 30:56-33:06, 47:09-51:24).

Defendant and SA Ball also discussed, among other things, what Defendant researched on the internet, how he met his girlfriend, how long he had been living with her, where he was from, his daily routine, the storage on his computer's hard drive, and the kind of video games he played. (Gov't Ex. 1, at 26:35-29:55, 47:09-1:03:02). Towards the end of the interview, SA Ball asked Defendant once more if he wanted to talk to SA Ball to which Defendant responded, "I don't

know." (Id. at 1:03:02-1:06:45). SA Ball again assured Defendant that he was not under arrested, he would not be upset if Defendant chose not to speak to him, and how to contact SA Ball if he changed his mind. (Id. at 1:08:58-1:13:45). SA Ball then concluded the interview at approximately 10:42 a.m., and he asked no further questions of Defendant. (Tr. 28; Gov't's Ex. 1, at 1:15:36). SA Ball provided Defendant a copy of the search warrant and the evidence receipt of the items that were taken during the search. (Tr. 30). Defendant was not arrested on May 21, 2019. (Id.).

SA Ball testified at the June 23, 2021, Motions Hearing that he did not give Defendant a recitation of his Miranda[5] rights during the May 21st interview because Defendant was not under arrest at the time. (Tr. 22). SA Ball testified that his primary purpose that day was to execute the search warrant—not to interview Defendant. (Id. at 23). SA Ball further testified that Defendant did not attempt to leave, and that, other than SA Ball's partner coming into the kitchen to identify a key, no other law enforcement officers entered the kitchen to stand over or near Defendant. (Id. at 27-28, 44). SA Ball also testified that neither he nor Inv. Heinreich made any threats, nor did they brandish or unholster their firearms. (Id. at 29). Lastly, SA Ball testified that, while Defendant was visibly nervous, he was communicating clearly during the whole May 21st interview. (Id. at 30).

On August 1, 2019, at approximately 2:00 p.m., SA Ball returned to the Residence in order to return some items that were taken during the May 21, 2019, search. (Tr. 31). Specifically, SA Ball returned a computer tower and a laptop that had been determined to contain no contraband. (Id.). SA Ball was accompanied by his partner, Special Agent Craig Heidenreich ("SA Heidenreich"). (Id.). SA Ball "casually" knocked on Defendant's door, and Defendant opened the door. (Id. at 32). SA Ball advised Defendant that he had some items that he was returning,

---

[5] Miranda v. Arizona, 384 U.S. 436 (1966).

and he asked Defendant if he could come in to fill out some paperwork.  (Id. at 32).  Defendant allowed SA Ball to enter the Residence.  (Tr. 32).  After Defendant signed for the return of the items, SA Ball asked Defendant if he was willing to sit down and talk with him again.  (Id.). Defendant agreed. (Id.).

SA Ball and Defendant then went into the kitchen, and SA Ball, once again, placed a recording device on the kitchen table and recorded the interview.  (Id. at 32, 35).  During the interview, SA Ball sat on the side closest to the stove, SA Heidenreich stood up against a cabinet on the opposite side of the refrigerator, and Defendant was sitting on the side of the table closest to the wall.  (Id. at 36).

SA Ball began the second interview by identifying himself, SA Heidenreich, and Defendant, providing the address of the Residence; and stating the time as 1:58 p.m.  (Gov't's Ex. 1, at 00:01-00:20).  SA Ball then reminded Defendant that he did not need to speak with him if Defendant did not want to; that he was not under arrest nor would he be arrested that day; and that if he chose to speak to SA Ball, he would prefer the truth and not a lie to avoid federal charges of lying to an agent.  (Id. at 00:20-01:09).  SA Ball also informed Defendant that anything said "would be between the three of us.  [SA Ball would not] tell anybody what [Defendant] [said]."  (Id. at 00:55-01:00).  SA Ball testified at the June 23, 2021, Motions Hearing that he made this assurance to calm Defendant's anxiousness in case he was concerned that his girlfriend would learn about what Defendant said; he was not trying to trick the Defendant.  (Tr. 34-35).

SA Ball then proceeded to say that Defendant "knew why [they were there]," and that "stuff" was found on his thumb drive.  (Gov't's Ex.1, at 01:26-02:13).  After a long pause, Defendant stated, among other things, that "it was a mistake"; that "life was getting hard . . . he wanted to hurt himself"; that he placed the files on his thumb drive; and that he would view the files while home alone or late at night.  (Id. at 03:35-12:50).  Defendant then stated, "I think I've

said all I can right now," to which SA Heidenreich said, "If you're talking about mental health . . . you have to get the weight off your shoulders." (Id. at 12:25-12:47). Defendant responded, "I'm trying, but right now my anxiety is getting too much. I don't know, I just don't think I'll be able to be helpful." (Id. at 12:47-12:57). SA Ball then responded, "Just a couple of more questions," and continued to question Defendant. (Id. at 12:57-13:01). A few minutes later, Defendant was asked if there is "anything else [he has] to get off [his] chest," and Defendant responded, "I don't have anything relevant to add, just . . . I wanted to stop. I know that doesn't change anything." (Gov't's Ex. 1, at 14:39-15:28). A few minutes later, Defendant stated, "I don't think I can answer anything right now" and "I don't think I'm going to be able to give good answer rights now." (Id. at 17:20-19:45). Moments later, Defendant stated, "Okay, I need to be done right now," at which point SA Ball responded, "Okay," and concluded the interview. (Id. at 20:28; Tr. 36-37). SA Ball and SA Heidenreich then left the Residence. (Tr. 37).

At the June 23, 2021, Motions Hearing, SA Ball testified that during the August 1st interview the Defendant never attempted to stand up or leave, and that throughout the interview, neither he nor SA Heidenreich moved from their positions, made any threats, or raised their voices. (Id. at 35-36). SA Ball further testified that neither his nor SA Heidenreich's service weapon were visible, and neither of them removed their service weapon or brandished it. (Id. at 33). Defendant was not arrested on August 1, 2019. (Id. at 37).

## II. Defendant's Motions to Suppress Statements. [Docket No. 19].

Defendant moves this Court for an Order suppressing his May 21, 2019, and August 1, 2019, statements to SA Ball. (See Def.'s Mot. [Docket No. 19]). In support of this request, Defendant argues that these statements were obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966). (Def.'s Mem., [Docket No. 52], at pp. 5-15).

### A. Standard of Review

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Accordingly, Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444). "Interrogation under Miranda includes not only express questioning but also its functional equivalent, such as 'any word or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." United States v. Hull, 419 F.3d 762, 767 (8th Cir. 2005) (quoting Rhode Island v. Innis, 466 U.S. 291, 300–01 (1980)).

A defendant is entitled to a Miranda warning prior to custodial interrogation. Miranda, 384 U.S. at 444-45. Interrogation for Miranda purposes includes "any questioning or conduct that the government officer should know is reasonably likely to elicit an incriminating response." United States v. McLaughlin, 777 F.2d 388, 390 (8th Cir. 1985). Whether an incriminating response is sought by an officer is determined "from the perspective of the suspect" and not by the officer's actual intent. United States v. Richardson, 427 F.3d 1128, 1132 (8th Cir. 2005).

A defendant may waive their rights, "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444.

### B. Defendant's May 21, 2019, Statements

Defendant contends that his May 21, 2019, statements to SA Ball and Inv. Heinreich should be suppressed because law enforcement officers failed to provide Defendant with a Miranda

warning, and at the time he made the statements, Defendant was in "law enforcement custody and not free to leave."  (Def.'s Mem., [Docket No. 52], at pp. 14-15).

Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury, 511 U.S. at 322 (quoting Miranda, 384 U.S. at 444). To be subject to suppression under Miranda, a statement must be made while in custody and in response to interrogation. United States v. McGlothen, 556 F.3d 698, 701 (8th Cir. 2009) (citing United States v. Londondio, 420 F.3d 777, 783 (8th Cir. 2005)).

It is undisputed that SA Ball and Inv. Heinreich's express questioning of Defendant constituted interrogation. Accordingly, the first issue before the Court is whether Defendant was in custody for the purpose of Miranda during his May 21st interview with SA Ball and Inv. Heinreich.  See United States v. Axsom, 289 F.3d 496, 500 (8th Cir. 2002) ("[T]he undisputed facts establish that [the officers] were interrogating [the defendant]. To determine whether Miranda rule applies, we must examine whether [the] interrogation was custodial.")

The Eighth Circuit has explained:

[W]e outlined six common indicia of custody which tend either to mitigate or aggravate the atmosphere of custodial interrogation. The indicia are: (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during the questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

The first three indicia are mitigation factors, which, if present, mitigate against the existence of custody at the time of questioning. Conversely, the last three indicia are aggravating factors which, if present, aggravate the existence of custody. We have emphasized these six indicia of custody are representative and are not exclusive. A finding of custody does not require the factual circumstance of a case

to present all indicia; and a particular strong showing of one factor may compensate
for a lesser or non-existent showing of another factor.

Id. at 500–01 (citations omitted).  "These factors, however, are not exclusive, and custody cannot
be resolved merely by counting up the number of factors on each side of the balance and rendering
a decision accordingly."  United States v. Flores-Sandoval, 474 F.3d 1142, 1147 (8th Cir. 2007)
(citations and quotation marks omitted).  "The analysis depends upon a review of the totality of
the circumstances, and [t]he ultimate test is whether a reasonable person in that position would
have felt free to end the interview."  United States v. Sanchez, 676 F.3d 627, 630–31 (8th Cir.
2012) (citations and quotations omitted) (alterations in Sanchez).

The first factor weighs heavily in favor of a finding that the suspect is not in custody when
officers clearly inform the suspect that he is free to leave or decline questioning.  Id. at 631. In the
present case, SA Ball repeatedly reminded Defendant on May 21st that he was not under arrest,
that he was not going to be arrested at the conclusion of the interview, and that it was Defendant's
right to stop answering questions if he changed his mind.  For each assurance, Defendant
responded that he understood.  SA Ball also stated that ". . . [Defendant] could [have] go[ne]
somewhere else, [or he] could [have] stay[ed] [t]here during the search . . ., [but Defendant] chose
to stay . . . in . . . [the] kitchen," to which Defendant agreed.

Therefore, in the present case, this factor weighs strongly in favor of finding that Defendant
was not in custody at the time of his May 21, 2019, statements to SA Ball and Inv. Heinreich. See,
e.g., United States v. Perrin, 659 F.3d 718, 721 (8th Cir. 2011) (noting that the Eighth Circuit Court
of Appeals has "never held that a person was in custody after" the person was informed he was
free to leave and did not have to answer questions) (emphasis added); United States v. Czichray,
378 F.3d 822, 826 (8th Cir. 2004); United States v. Ollie, 442 F.3d 1135, 1138 (8th Cir. 2006)
("While advising someone that he or she is not under arrest helps to mitigate an interview's

custodial nature, an explicit assertion that the person may end the encounter is stronger medicine. Such a statement provides an individual with a clear understanding of his or her rights and generally removes any custodial trappings from the questioning."). Accordingly, the fact that SA Ball repeatedly informed Defendant that the decision of whether to talk to law enforcement officers was completely voluntary and that Defendant was free to leave strongly mitigates in favor of finding that Defendant was not in custody. See Ollie, 442 F.3d at 1138.

The record presently before the Court does not clearly indicate whether Defendant possessed the freedom to move about during the interview on May 21, 2019. The inquiry here is how it would have objectively appeared to someone in Defendant's position regarding whether or not he had freedom of movement. See United States v. Rosenblum, No. 7-cr-294 (JRT/FLN), 2008 WL 608297, at *5 (D. Minn. Jan. 16, 2008). Here, there is no evidence that Defendant ever sought and or was ever denied the ability to move about, and SA Ball testified that Defendant did not attempt to leave.

Defendant contends that the second factor weighs in his favor because he was placed between two armed officers, constantly watched, and confined to his kitchen for one hour and twenty minutes. (Def's Mem., [Docket No. 52], at p. 8). However, where Defendant did not attempt to leave, the second factor is unclear because "it is unclear what would have happened if [he] had" attempted to leave. See Sanchez, 676 F.3d at 631; Ollie, 442 F.3d at 1138 (providing that where defendant "never tried to move about or leave . . . it is impossible to determine if [he] retained his freedom of movement").

Therefore, on the present record, this second mitigating factor is neutral regarding whether or not Defendant was in custody.

The third factor, which addresses whether Defendant initiated contact with the police or voluntarily acquiesced to the questioning by the police, mitigates in favor of finding that Defendant

was not in custody as Defendant clearly agreed to speak with law enforcement. See Axsom, 289 F.3d at 501 (concluding that the third factor mitigated a finding that the defendant had been in custody where he voluntarily acquiesced to police questioning).

In the present case, although the interview was initiated by SA Ball, Defendant agreed to the interview.  The audio recording supports SA Ball's testimony that Defendant was not threatened, was alert, politely communicating during the whole interview, and even stated that he was trying to be cooperative.  While Defendant did tell the officers that he was having a hard time formulating his words because of his anxiety and that he did not know if he should speak with the officers, there is no evidence that Defendant ever sought to terminate the interview.   The Defendant's "decision not to terminate the interview and to allow the interview to proceed to its closing suggests an exercise of free will, rather than restraint to a degree associated with formal arrest." See, e.g., Czichray, 378 F.3d at 829; Axsom, 289 F.3d at 502 (noting that where defendant was "extremely friendly and cooperative" during the interview it supports a finding that he voluntarily acquiesced).

The fourth factor, which addresses whether law enforcement used strong arm tactics or deceptive stratagems against a suspect during the questioning, does not aggravate in favor of finding that Defendant was in custody during the May 21, 2019, interview. The Court finds no evidence on the present record of strong-arm tactics or deceptive stratagems being used against the Defendant during the May 21, 2019, interview.

Defendant conclusorily asserts that this factor weighs in favor of finding he was in custody because, after informing SA Ball and Inv. Heinreich that he suffered from anxiety and depression, and was on social security, SA Ball "sought to establish rapport by playing into [Defendant's] mental health."  (Def.'s Mem., [Docket No. 52], at pp. 12-13). The undersigned finds the assertion unpersuasive. Defendant fails to articulate, and this Court does not find, any legal authority to

support his contention that informing the officers that he had anxiety, depression, and that he was on Social Security in any way indicates that his will was overborne thereby rendering him in custody during the May 21, 2019, interview.

While the officers were aware that Defendant was having a hard time formulating words because of his anxiety; that Defendant reported he was stressed and slipping in his mental health; and that he had not taken his medication for anxiety, the officers did not make any threats, there was no force applied, and Defendant was always responsive and cooperative. See United States v. LeBrun, 363 F.3d 715, 721 (8th Cir. 2004) (en banc) ("[T]he coercive aspects of a police interview are largely irrelevant to the custody determination except where a reasonable person would perceive the coercion as restricting his or her freedom to depart."); Id. at 724 ("A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair her capacity of self-determination). Accordingly, the Court finds no evidence on the present record of strong-arm tactics or deceptive stratagems being used against the Defendant during the May 21, 2019, interview.

The fifth factor, which addresses whether questioning took place in a "police dominated atmosphere," does not aggravate in favor of finding that Defendant was in custody during the May 21, 2019, interview.  The record now before the Court lacks any evidence that the May 21, 2019, interview of Defendant by SA Ball and Inv. Heinreich took place in a "police dominated atmosphere."

Defendant contends that this factor weighs "heavily" in favor of finding he was in custody because the interview took place in "his kitchen area with two law enforcement officers, one of which was interrogating and confronting [Defendant]."  (Def.'s Mem., [Docket No. 52], at p. 10). In this situation, Defendant argues the environment was police dominated because "it seems unlikely a reasonable person would have 'felt free to end the interview' and refuse to answer

questions." (Id.). Here again, Defendant fails to articulate any legal authority in support of this contention.

Further, Defendant argues that "there were police cars in front of his house" and "[s]even armed, uniformed and plain clothed officers, from two agencies execut[ing] a search warrant and encroach[ing] on [Defendant's] residence, searching for evidence." (Id.). However, "the fifth indicium is whether the questioning, not the execution of the search warrant, was police dominated." United States v. Wallace, 323 F.3d 1109, 1113 (8th Cir.2003) (emphasis in original). Indeed, "[a]ny warrant search is inherently police dominated; there is nothing untoward about [this] circumstance." Perrin, 659 F.3d at 721.; see also Axsom, 289 F.2d at 503. Thus, the fifth factor does not weigh in favor of a finding of custody.

SA Ball's testimony at the June 23, 2021, Motions Hearing, the photograph of Defendant's kitchen, and the audio recording of the May 21, 2019, interview of Defendant by SA Ball and Inv. Heinreich establishes that the interview took place in an adequately sized room with a window and two exits. Indeed, "[w]hen a suspect is interrogated in the comfort and familiarity of his home, a court is less likely to find the circumstances custodial." Axsom, 289 F.3d at 502 (citing United States v. Erving L., 147 F.3d 1240, 1247 (10th Cir. 1998)); see also, in accord, United States v. Wallace, 323 F.3d at 1113 (noting that interview occurring in the workplace was taking place in a familiar location where the interviewee would feel more comfortable and less threatened); Perrin, 659 F.3d at 721.

The Court finds that Defendant was not in a "police dominated atmosphere." Under similar circumstances where two officers were conducting an interview of a single defendant in a small room, this Court found that the environment there did not create a "police dominated atmosphere." See, e.g., United States v. Lofald, No. 15-cr-70 (ADM/LIB), 2015 WL 4636631, at *20 (D. Minn.

Aug. 3, 2015). Accordingly, the fifth factor does not aggravate in favor of Defendant being in custody during the May 21, 2019, interview.

Lastly, the sixth factor, which addresses whether Defendant was arrested at the end of the interview, clearly does not aggravate in favor of finding that Defendant was in custody during the May 21, 2019, interview. Defendant concedes that he was <u>not</u> arrested at the end of the interrogation, and therefore, does not argue that this factor weighs in his favor.

Upon consideration of the totality of the circumstance, the Court concludes that a reasonable person in Defendant's position would have objectively felt free to terminate the May 21, 2019, interview, and as such, Defendant was not in custody during the May 21, 2019, interview. Because Defendant was not in custody for the purposes of <u>Miranda</u> during the May 21, 2019, interview, Defendant is not entitled to have the statements he made during that interview suppressed pursuant to <u>Miranda</u>.

Therefore, to the extent Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 19], seeks an Order of this Court suppressing Defendant's statements made during the May 21, 2019, interview, the undersigned recommends that Defendant's Motion to Suppress Statements, Admissions, and Answer, [Docket No. 19], be **DENIED**.

### C. Defendant's August 1, 2019, Statement

As already noted above, Defendant also moves the Court for an Order suppressing his statements during his August 1, 2019, interview with SA Ball and SA Heidenreich. Because it is undisputed that SA Ball's express questioning of Defendant constituted interrogation, the sole issue, once more, is whether Defendant was in custody for the purpose of <u>Miranda</u> during his interview on August 1, 2019. See <u>Axsom</u>, 289 F.3d at 500.

Pursuant to the six-factor test provided above, the first factor weighs in favor of finding that Defendant was not in custody. While SA Ball did not explicitly inform Defendant that he was

free to leave, SA Ball did begin the interview by informing Defendant that he was <u>not</u> under arrest, that he would <u>not</u> be arrested that day, and that he did <u>not</u> have to speak with the officers.  Indeed, "[n]o governing precedent of the Supreme Court or the Eighth Circuit has yet held that a person was in custody after being clearly advised of his freedom to leave or terminate questioning." <u>Czichray</u>, 378 F.3d at 826.  Therefore, the Court finds that this factor mitigates in favor of finding that Defendant was not in custody.  <u>Perrin</u>, 659 F.3d at 721.

The record presently before the Court is once again somewhat limited regarding whether Defendant possessed the freedom to move about during the August 1, 2019, interview, because there is no indication in the record that Defendant attempted to leave after the interview commenced.  Therefore, this factor is neutral regarding whether or not Defendant was in custody.

The third factor weighs in favor of finding that Defendant was not in custody because, although SA Ball and SA Heidenreich initiated contact with Defendant when they arrived to return previously seized items, the Court finds that Defendant again agreed to voluntarily speak to the officers.  <u>See</u> <u>Axsom</u>, 289 F.3d at 501 (concluding that the third factor mitigated a finding that the defendant had been in custody where he voluntarily acquiesced to police questioning).  In the present case, SA Ball returned to Defendant's residence on August 1, 2019, in order to return some of the items seized in the May 21, 2019, search.  Defendant allowed SA Ball into his home in order to fill out some related paperwork.  Defendant then voluntarily agreed to speak with SA Ball and SA Heidenreich.  Therefore, the third factor weighs in favor of finding that Defendant was not in custody.

The fourth factor does not aggravate in favor of finding that Defendant was in custody during the August 1, 2019, interview.  The Court finds no evidence on the present record of strong-arm tactics or deceptive stratagems being used against the Defendant during the August 1, 2019, interview.  The audio recording of the August 1, 2019, interview provides that Defendant was

cooperative and responsive, and the officers were not threatening nor did they apply any physical force. Indeed, Defendant fails to argue altogether whether or not this factor weighs in his favor. Accordingly, the fourth factor weighs in favor of finding that Defendant was not in custody.

Defendant once again contends that the fifth factor weighs in his favor because the kitchen was a police-dominated atmosphere in that one Special Agent stood while the other sat across from Defendant, and because "[t]hey held property belonging to [the Defendant]." (Def.'s Mem. [Docket No. 52], at pp. 10-11). However, the Court finds this argument unpersuasive.

Not only were SA Ball and Inv. Heidenreich the only officers anywhere on the premises or in the Residence, as opposed to the May 21, 2019, interview, but as already noted above, Defendant's kitchen was an adequately sized room with a window and two exits. See Czichray, 378 F.3d at 826-27; see also Axsom, 289 F.3d at 502. Furthermore, there is nothing in the record that the officers positioned themselves or acted in any way to inhibit Defendant's exit. Indeed, Defendant fails to articulate any legal authority in support of his contention. See e.g., United States v. Veit, No. 2:11-CR-04055-BCW, 2014 WL 5393977, at *4 (W.D. Mo. Oct. 22, 2014) (holding that Defendant was not in a police-dominated atmosphere where, while being interrogated in the sunroom of his house, Defendant was sitting on the couch, an FBI agent was sitting in a chair across from Defendant, and a second FBI agent was standing at the end of the couch).

Lastly, Defendant concedes, and the Court agrees, that the sixth factor weighs against a finding of custody because Defendant was not arrested at the end of the interrogation.

Upon consideration of the totality of the circumstance, the Court concludes that a reasonable person in Defendant's position would have objectively felt free to terminate the interview, and as such, Defendant was not in custody during the August 1, 2019, interview. Because Defendant was not in custody for the purposes of Miranda, Defendant is not entitled to have the statements he made during that second interview suppressed pursuant to Miranda.

Therefore, to the extent Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 19], seeks an Order of this Court suppressing Defendant's statements made during the August 1, 2019, interview, the undersigned recommends that Defendant's Motion to Suppress Statements, Admissions, and Answer, [Docket No. 19], be **DENIED**.

### III.    Conclusion

Therefore, based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1. Defendant's Motion to Suppress Statements, Admissions and Answers, [Docket No. 19], be **DENIED**.

Dated: September 23, 2021                                 s/Leo I. Brisbois
                                                          Hon. Leo I. Brisbois
                                                          U.S. MAGISTRATE JUDGE

### N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.