UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Crim. No. 20-268 (JRT/LIB) |
| v. | MEMORANDUM OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION |
| BRANDON ROBERT HARKINS, | |
| Defendant. | |

---

Lindsey E. Middlecamp, **UNITED STATES ATTORNEY'S OFFICE**, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for plaintiff.

Manvir K. Atwal, **OFFICE OF THE FEDERAL DEFENDER**, 300 South Fourth Street, Suite 107, Minneapolis, MN 55415, for defendant.

Defendant Brandon Robert Harkins filed a Motion to Suppress Statements, Admissions, and Answers he made to law enforcement officers. After a hearing and additional briefing from the parties, Magistrate Judge Leo Brisbois issued a Report and Recommendation ("R&R"), recommending that Harkins's motion be denied. Harkins objected to this recommendation. Because the Court finds that Harkins was not in custody at the time of the interrogation, the officers were not required to give him *Miranda* warnings.[1] Therefore, the Court will overrule Harkins's objection, adopt the R&R, and deny the Motion.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

## BACKGROUND

**I.  FACTUAL BACKGROUND**

There are no objections to the factual statements contained in the Magistrate Judge's R&R, which the Court adopts and summarizes here.  (R&R at 1–8, Sept. 23, 2021, Docket No. 60.)

On May 21, 2019, Federal Bureau of Investigation Special Agent Timothy Ball ("SA Ball") along with six other law enforcement officers executed a search warrant at Harkins's residence to search for and seize electronic devices allegedly containing images of child pornography.  (June 23, 2021 Hr'g Tr. at 17–19, July 7, 2021, Docket No. 44.) About 9:00 a.m., SA Ball and a uniformed police officer knocked on Harkins's door, Harkins opened it, and SA Ball advised Harkins that he had a search warrant for his residence.  (*Id.* at 17–20.)  SA Ball ushered Harkins into the living room without physical contact where Harkins took a seat on the couch as the rest of the search team completed a protective sweep and began to search Harkins's residence.  (*Id.* at 20.)  No one asked Harkins any interrogative questions while he was in the living room.  (*Id.* at 41.)

About 20 to 30 minutes later, SA Ball asked Harkins to speak with him, Harkins agreed, and they moved to the kitchen.  (*Id.* at 20–21, 41.)  Harkins, SA Ball, and St. Louis County Sheriff's Office Investigator Steven Heinreich ("Inv. Heinreich") sat at the kitchen table with SA Ball and Inv. Heinreich on one side and Harkins on the other.  (*Id.* at 26.) The kitchen has a window and multiple exits leading toward the living room, front door,

bedrooms, bathroom, and garage.[2] (*Id.* at 27.) Harkins could have gone into the garage or another part of the house without passing by either SA Ball or Inv. Heinreich. (*Id.* at 27–28.)

SA Ball placed a recording device on the table, started recording, and then began talking to Harkins. (*Id.* at 21.)[3] SA Ball repeated that he had a search warrant and told Harkins he was not under arrest, would not be arrested that day, and that SA Ball wanted to speak with him. (Gov't Ex. 1, 05-21-19 Interview ("May Interview") at 00:24–00:58.) Harkins responds by saying "Yes." (*Id.*) SA Ball then repeatedly advises Harkins that he does not have to talk or answer any questions and that he can start answering questions and then stop at any time. (*E.g.*, *id.* at 00:59–01:25.) Harkins responded to these statements by saying "Yes" on multiple occasions including in response to SA Ball's prompt of "You understand all that, right? You don't have to talk to me." (*Id.* at 00:59–01:40.) During one of these reminders, SA Ball reminded Harkins that he had previously told him he could go somewhere else outside the residence during the search or stay and commented that Harkins had chosen to stay. (*Id.* at 04:55–05:02.) Harkins agreed that this was true. (*Id.*)

---

[2] The R&R indicates that there are two exits from the kitchen. (R&R at 2–3.) Neither party objects to this finding. SA Ball's testimony at the Hearing, however, could be interpreted as indicating that there were more than two exits. (*See* Hr'g Tr. at 27.)

[3] At the Hearing and without objection, the United States offered as "Government's Exhibit 1" a thumb drive with two audio files: (1) a recording of the May 21, 2019 interview with Harkins and (2) a recording of the August 1, 2019 interview with Harkins. (R&R at 3 n.4; Hr'g Tr. at 22.)

SA Ball told Harkins they were there to investigate some downloads traced to Harkins's residence and would like to get his "side of the story." (*Id.* at 04:25–04:34.) While repeating that Harkins did not have to speak, SA Ball did warn him that lying to a federal agent is against the law. (*Id.* at 05:10–6:01.) SA Ball then asked Harkins if he wanted to answer some questions to which Harkins responded "I'm . . . not sure how to . . . my anxiety was pretty difficult before and I'm having trouble putting my . . . words together." (*Id.* at 06:15–06:38.)

For about the next twenty minutes, SA Ball and Inv. Heinreich asked Harkins whether he wanted to talk, told Harkins it was a lot of weight to carry everything on his shoulders, and repeated that he did not have speak with them. (*Id.* at 06:38–25:00.) During this time, Harkins again responded that he was having troubles putting his words together, was having a hard time thinking, and was struggling with anxiety. (*Id.*) The officers told him that talking might alleviate his anxiety, that holding in secrets would wear him down, and encouraged Harkins to begin "opening yourself up to your innermost secrets," to "cleanse your soul," and to "unlock that lock" by telling them what happened. (*Id.* at 18:35–18:40; 21:38–21:49; 33:10–34:12; 42:58–43:30.)

About 25 minutes into the interview, Harkins began to speak more and answer questions from SA Ball. Harkins began discussing various aspects of his life, his internet habits, what he researched on the internet, his electronic devices, how internet downloading programs work, and answering other questions SA Ball and Inv. Heinreich

asked him while repeating he was having a hard time.  (*E.g., id.* at 25:00–29:55; 40:40–40:55; 47:30–1:03:00.)  He discussed his mental health issues including therapy for his anxiety and that he was on Social Security disability for depression and anxiety and his fears of repercussions from relapsing.  (*See, e.g.*, *id.* at 20:35–21:20; 30:52–31:20; 47:09–47:30.)  Harkins said he wanted to be cooperative.  (*Id.* at 32:56–33:06.)  In the middle of the interview, SA Ball informed Harkins that they would leave as soon as the search was complete even if he did not want to speak to them.  (*Id.* at 42:45–42:48; 43:10–43:25.)

Near the end, Harkins was again asked if he wanted to talk to which he responded, "I don't know."  (*Id.* at 1:06:33–1:06:45.)  SA Ball again told Harkins he was not under arrest, he did not have to speak, and that he could contact SA Ball if he wanted to talk more.  (*Id.* at 1:08:42–1:13:30.)  Harkins confirmed he knew how get in contact.  (*Id.*)

When the search ended, SA Ball gave Harkins a copy of the search warrant and a receipt of the items seized, and all officers left.  (Hr'g Tr. at 30.)  Law enforcement did not arrest Harkins on May 21, 2019.  (*Id.* at 30–31.)

The May 21, 2019 interview lasted about 1 hour, 15 minutes in total.  (May Interview.)  At no point did anyone inform Harkins of his *Miranda* rights.  (*See* Hr'g Tr. at 22, 39.)  Whenever there are quiet parts in the recording, SA Ball testified that nothing was physically happening.  (*Id.* at 30.)  According to SA Ball, Harkins never attempted to stand or leave and that all three remained seated with just the three of them in the room except an instance where another agent briefly entered the room to identify a key and

once where SA Ball went to talk to another agent. (Hr'g Tr. at 28–29; May Interview at 14:26–14:51, 15:35–15:58.) Other officers can be heard moving around the residence conducting the search on the recording. (*See, e.g.*, May Interview at 05:10–05:22, 12:37–13:05, 34:36–34:59.) SA Ball testified that at no point did anyone threaten Harkins, unholster a firearm, or talk in more than a conversational tone. (Hr'g Tr. at 28–29.) According to SA Ball, although Harkins was visibly nervous, he was able to clearly communicate throughout the interview. (*Id.* at 29–30.)

On August 1, 2019, SA Ball came back to Harkins's residence with Special Agent Craig Heidenreich ("SA Heidenreich") to return some items taken during the search that they determined were not of interest. (*Id.* at 31.) At about 2:00 p.m., SAs Ball and Heidenreich—both dressed in plain, casual clothes—knocked on Harkins door. (*Id.* at 31–32.) After Harkins answered the door, SA Ball told Harkins that he was returning some items and asked if they could come in to fill out some paperwork. (*Id.* at 32.) Harkins allowed them in and signed the paperwork. (*Id.*)

SA Ball then asked if Harkins would be willing to talk; Harkins agreed. (*Id.*) They went to the kitchen where SA Ball again placed a recording device on the table and recorded the conversation. (*Id.* at 32, 35.) SA Ball sat in the same place he had for the May 21 interview, SA Heidenreich stood against a cabinet on the side of the refrigerator, and Harkins sat on the side of the table closest to the wall. (*Id.* at 36.)

After stating various identifying information, SA Ball told Harkins (1) he did not need to speak with the agents; (2) he was not under arrest and would not be arrested that day; (3) Harkins should tell the truth as lying to a federal agent was a crime; and (4) that SA Ball would not tell anybody what Harkins said. (Gov't Ex. 1, 08-01-19 Interview ("Aug. Interview") at 00:20–01:00.) SA Ball testified at the hearing that he stated the conversation would remain between the three of them to let Harkins know SA Ball would not share the conversation with Harkins's girlfriend. (Hr'g Tr. At 34–35.) SA Ball explained that he was not trying to trick Harkins. (Hr'g Tr. at 35.)

SA Ball stated that Harkins knew why they were there and that various things had been found on the devices seized during the May search. (Aug. Interview at 01:12–2:13.) Eventually Harkins said, among other things, "it was a mistake," that he downloaded and placed the files on a thumb drive, and that he would view the files while home alone or late at night. (*Id.* at 03:35–12:35.) Harkins then said, "I think I might have said all I can right now." (*Id.* at 12:25–12:35.) SA Heidenreich told Harkins, "And you're talking about mental health. . . . You gotta get the weight off your shoulders." (*Id.* at 12:40–12:44.) Harkins replied, "I'm trying, but right now my anxiety is getting too much. I don't know. I don't think I'll be able to be helpful." (*Id.* at 12:47–12:57.) SA Ball said that he had a couple more questions and continued questioning Harkins. (*Id.* at 12:58.) Harkins was asked if he had anything else he wanted to get off his chest to which Harkins responded, "I don't have anything relevant to add. Just . . . I wanted to stop. I know that doesn't

change anything." (*Id.* at 14:36–15:15.) Harkins again asserted "I don't think I can answer anything right now" and "I don't think I'm going to be able to give good answers right now." (*Id.* at 17:25; 19:45.) Harkins then stated, "I think I need to be done right now." (*Id.* at 20:26.) SA Ball responded "Okay," ended the interview, and the agents left Harkins's residence. (*Id.* at 20:28; Hr'g Tr. 36–37.)

The August interview lasted approximately 20 minutes. (Aug. Interview.) Again, no one informed Harkins of his *Miranda* rights. (*See* Hr'g Tr. at 47.) SA Bell testified that the tone of the interview was calm and causal, no one threatened or moved toward Harkins during interview, and their weapons were never unholstered and were not visible. (*Id.* at 33–34, 36.) According to SA Ball, Harkins never stood up, attempted to leave, or asked to leave during the interview. (*Id.* at 35.)

## II. PROCEDURAL HISTORY

Harkins was indicted for one count of receipt of child pornography in violation of 18 U.S.C. §§ 2252(a)(2) and 2252(b)(1), three counts of distribution of child pornography in violation of 18 U.S.C. §§ 2252(a)(2) and 2252(b)(1), and one count of possession of child pornography in violation of 18 U.S.C. §§ 2252(a)(4)(B) and 2252(b)(2). (Indictment, Nov. 17, 2020, Docket No. 1.) Harkins moved to suppress the statements he made in the May 21, 2019 and August 1, 2019 interviews with SA Ball. (Mot. Suppress Statements, Admissions & Answers, Dec. 28, 2020, Docket No. 19.) On June 23, 2021, the Magistrate Judge held a hearing on the Motion. (Min. Entry, June 23, 2021, Docket No. 42.) The

parties filed post-hearing briefs on the Motion. (Def.'s Mem. Supp., Aug. 10, 2021, Docket No. 52; Gov't Resp. Opp., Aug. 26, 2021, Docket No. 59.) The Magistrate Judge issued an R&R recommending the Court deny Harkins's Motion to Suppress. (R&R, Sept. 23, 2021, Docket No. 60.) Harkins objected to the R&R. (Def.'s Obj. R&R, Oct. 7, 2021, Docket No. 61.)

## DISCUSSION

### I.   STANDARD OF REVIEW

After an R&R is filed by a magistrate judge, "a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Crim. P. 59(b)(2); *accord* 28 U.S.C. § 636(b)(1); D. Minn. LR 72.2(b)(1). For a dispositive matter, such as a motion to suppress evidence, "[t]he district judge must consider de novo any objection to the magistrate judge's recommendation." Fed. R. Crim. P. 59(b)(1), (3); *accord* 28 U.S.C. § 636(b)(1); D. Minn. LR 72.2(b).

### II.  ANALYSIS

To maintain a person's Fifth Amendment rights, courts generally do not permit the admission of statements a person makes during a custodial police interrogation unless the person was given the *Miranda* warnings before the statements are made. *Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966); *United States v. Magallon*, 984 F.3d 1263, 1282 (8th Cir. 2021). *Miranda* applies only if the person was (1) interrogated (2) while in custody. *United States v. Cowan*, 674 F.3d 947, 957 (8th Cir. 2012). "A question is an

interrogation if it is 'reasonably likely to elicit' incriminating information." *Id.* at 958 (quoting *Pennsylvania v. Muniz*, 496 U.S. 582, 600–01 (1990)).

It is undisputed that Harkins was not given the *Miranda* warnings before he was interviewed on May 21, 2019 and August 1, 2019 and that he was interrogated for the purposes of *Miranda* as the interviews were meant to elicit incriminating information. (*See* Hr'g Tr. at 22, 47; Gov't Resp. Opp. at 3; Gov't Resp. Opp. Obj. R&R at 2, Oct. 18, 2021, Docket No. 62.)  Therefore, the only issue here is whether Harkins was in *Miranda* custody during either interview.

A person is in *Miranda* custody if the person is "questioned while in custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 445.  The Eighth Circuit has identified six non-exhaustive factors for courts to consider when determining whether an interrogation is custodial:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Sanchez*, 676 F.3d 627, 630 (8th Cir. 2012) (quoting *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990).  The first three factors are mitigating, meaning that

their presence indicates that it is less likely the person is in custody; the remaining three factors are coercive, meaning that their presence indicates that it is more likely the person is in custody. *Griffin*, 922 F.2d at 1349. Courts consider the totality of the circumstances to determine if "a reasonable person in that position would have felt free to end the interview." *Sanchez*, 676 F.3d at 630–31 (quoting *United States v. Aldridge*, 664 F.3d 705, 711 (8th Cir. 2011)).

### A. May 21 Interview

The Court will first consider whether Harkins was in *Miranda* custody during the May 21 Interview.

The first factor strongly supports a conclusion that Harkins was not in custody. SA Ball repeatedly told him that he was not under arrest, that he would not be arrested that day, and that he was not required to answer questions. SA Ball also informed Harkins that he could start answering and stop at any time. Harkins argues that these statements, while possibly mitigating, were not the "stronger medicine" of explicitly asserting that the person may end the encounter. *See United States v. Ollie*, 442 F.3d 1135, 1138 (8th Cir. 2006). Although statements that a person is not under arrest may fall "short of an ideal," they still weigh against a determination that a person is in custody. *Id.* Moreover, here SA Ball provided more than the "less than ideal" statements because he told Harkins he could refuse to answer and reminded Harkins that he could choose to go somewhere else or to stay in the residence during the search. *See id.* Harkins agreed that he chose to stay

-11-

there. SA Ball also told Harkins that all the agents would leave as soon as they were done with the search. In sum, Harkins received "abundant advice" that he could terminate the interview. *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004). The first factor, therefore, weighs strongly in favor of finding that Harkins was not in custody during the May Interview.

The second factor, though less clear cut, supports a finding that Harkins was not in custody because it is likely that Harkins possessed freedom of movement. He was not restrained in any way nor denied the ability to move. SA Ball told him before and during the interview that he could leave. Harkins agreed that he had chosen to stay. Moreover, he was able to leave the room without passing by either officer. While SA Ball directed Harkins into the living room upon his arrival, a reasonable person could have realized this was not to restrict Harkins but to protect the search team and the integrity of the search especially as the other officers used this time to complete a protective sweep. *See United States v. Axsom*, 289 F.3d 496, 503 (8th Cir. 2002). On the other hand, Harkins was in a room with two officers—one of whom was visibly armed—while five others could be heard and at times seen searching the house. Because Harkins never attempted to leave or even stand up during the interview, it is difficult to determine the full degree of his freedom of movement. *See Ollie*, 442 F.3d at 1138. On balance, this factor somewhat supports the conclusion that he was not in custody.

The third factor also supports a finding that Harkins was not in custody. Although he clearly did not initiate contact, he acquiesced to questioning. Before the interview began, SA Ball asked Harkins if he would answer some questions and he agreed to. Harkins indicated that he understood that he did not have to answer questions but did so anyway. On the other hand, the recording suggests he was at times reluctant and unsure whether to answer questions and there is one period of approximately 30 minutes where he responded to very few questions. While he did acquiesce, he was hesitant and halting, not enthusiastic for much of the interview. *See Axsom*, 289 F.3d at 501–02. However, "a defendant does not need to be enthusiastic about an interview for us to conclude that he voluntarily acquiesced." *Ollie*, 442 F.3d at 1138. Still, he remained cooperative and never specifically tried to terminate the interview, even saying he was trying to cooperate. This factor somewhat supports the conclusion that he was not in custody.

As to the fourth factor, the record does not show that SA Ball and Inv. Heinreich used deceptive or strong-arm tactics on Harkins. Harkins argues that suggesting he unburden himself, that he had a lot weighing on his shoulders, and that the agents attempted to build a rapport with Harkins coupled with continuing the interview after Harkins informed the officers that he had anxiety and depression and was on disability shows that they were strong arming Harkins. As the Magistrate Judge observed, Harkins did not—and still does not—provide any legal authority supporting that these are strong arm tactics that can overbear a person's will. The Court has concerns about the use of

"open yourself up to your innermost secrets," "cleanse your soul," and "a lot weighing on your shoulders" language in the context of an interview of a person clearly experiencing anxiety and mental health issues. The agent appears to be encouraging Harkins to confess in a manner that could be viewed as coercive. But, early in the interview and before he informed the officers about the extent of his mental health issues including being on Social Security, he agreed that he had chosen to stay. He stated he wanted to be cooperative. Thus, Harkins's argument is not supported by the law. *Cf. United States v. Perrin*, 659 F.3d 718, 721 (8th Cir. 2011) ("Because [defendant] has not crossed the factual threshold, we need not consider this issue [of when mental deficits might establish custody] further on the law."). The officers also never applied force or threatened Harkins in any way. The fourth factor does not support the conclusion that Harkins was in custody.

Harkins asserts the fifth factor supports a finding that he was in custody arguing that it was a police-dominated environment as he was interrogated by two police officers in a room while five others searched his house with multiple police cars parked outside. It is true that "[a]ny warrant search is inherently police dominated," but "there is nothing untoward about that circumstance." *Perrin*, 659 F.3d at 721. The Eighth Circuit has found that even when nine people participate in the execution of a warrant and two conduct an interview, it is not necessarily police dominated. *Axsom*, 289 F.3d at 502. The key question is whether the questioning, not the execution of the warrant, is police

dominated. *United States v. Wallace*, 323 F.3d 1109, 1113 (8th Cir. 2003). Harkins was interviewed by two seated officers in his own home where he could exit without passing the officers. This does not support a finding that it was police dominated. Taken together, these facts do not suggest that Harkins was in custody.

Finally, it is undisputed that Harkins was not arrested at the end of the interview. Therefore, Harkins does not argue and nothing suggests that this factor supports a finding that Harkins was in custody.

In addition to these six factors, the interview ended, and all officers left shortly after the search was finished. This supports SA Ball's promise that law enforcement would leave once they were done with the search and that Harkins would be left there. No evidence suggests that officers unnecessarily extended the search to put additional pressure on Harkins.

After considering the totality of the circumstances, the Court concludes that a reasonable person in Harkins's position would have felt free to end the May interview. Crucially, SA Ball had informed Harkins before the interview began that Harkins did not need to stay and did not need to answer questions. The Eighth Circuit has "never held that a person was in custody after receiving" similar admonitions. *Perrin*, 659 F.3d at 721. He was not deprived of his freedom of action in any significant way. Harkins was not in custody, so no *Miranda* warnings were required. Therefore, the Court will overrule

Harkins's objection, adopt the Magistrate Judge's recommendation, and deny the Motion to Suppress as it pertains to the May 21, 2019 statements.

### B.     August 1 Interview

It is again undisputed that Harkins was not informed of his *Miranda* rights before the August 1, 2019 interview and that this interview was also a *Miranda* interrogation. The Court again considers only whether Harkins was in custody for the purposes of *Miranda* for the August 1, 2019 interview by considering the totality of the circumstances.

The first factor supports the conclusion that Harkins was not in custody. Although SA Ball did not remind Harkins that he was free to leave like he did during the May interview, he advised Harkins he was not under arrest, would not be arrested, and could refuse to speak with the officers. While perhaps not as strong as the May Interview, these reminders still support a finding that Harkins was not in custody. *See Sanchez*, 676 F.3d at 631.

The second factor somewhat supports the conclusion that Harkins was not in custody. It is difficult to determine whether he had full freedom of movement because he again did not try to leave. Just as with the May Interview, however, Harkins was not restrained in any way nor denied the ability to move while in a room with multiple exits. It appears he could have left the room without passing by either officer. There also were no other officers moving around the house that could have assisted in restraining him.

The third factor supports a finding that Harkins was not in custody. He did not initiate contact, but he acquiesced to questioning. Here he allowed the agents into his house rather than being forced to allow them in by a search warrant. He was again asked before the interview began if he would answer some questions and he agreed. The recording also suggests he was less reticent and more willing to answer than during the May interview even if still not enthusiastic. This factor more strongly supports the conclusion that he was not in custody than it did for the May Interview.

The fourth factor does not support a finding that Harkins was in custody. Harkins argues that the officers used his property to get him to speak, but nothing in the record suggests they held the property hostage, suggested they would only return it if he spoke, or otherwise used his property to coerce him. Instead, they had completed the paperwork and handed over the property before asking Harkins if he would answer questions.

Similarly, as to the fifth factor, the environment was less police dominated on August 1. There were only two officers. There was no invasive search underway. The agents entered by Harkins's consent rather than the compulsion of a search warrant. The interview was conducted in the same room with multiple exits. Harkins was still on his home turf. *See Czichray*, 378 F.3d at 826. The only thing that was arguably more police dominated was that SA Heidenreich stood, rather than sat as Inv. Heinreich had. SA Ball and SA Heidenreich still did not inhibit Harkins's exit and nothing suggests SA Heidenreich

stood in a manner that was menacing or was meant to intimidate Harkins. Although, they held property belonging to Harkins, they had shown that they were returning property to him when they were able. In sum, the fifth factor does not suggest that Harkins was in custody.

Finally, Harkins was not arrested after the interview therefore the sixth factor does not weigh in favor of finding that Harkins was in custody.

Two other considerations also support the conclusion that Harkins was not in custody. First, Harkins now had a history with SA Ball. From the previous interview Harkins knew SA Ball would leave without arresting him after an interrogation. He knew that SA Ball would not repeatedly badger or harass Harkins as shown by more than two months passing between encounters and the second encounter beginning by returning property. Second, while SA Ball continued to question Harkins after Harkins said he could not answer too much, as soon as Harkins said that he needed to be done, SA Ball immediately terminated the interview. This shows that Harkins was in fact free to terminate the interview.

After again considering the totality of the circumstances, the Court concludes that a reasonable person in Harkins's position would have felt free to end the August interview. Harkins was not deprived of his freedom of action in any significant way. Harkins was not in custody for the August interview, so no *Miranda* warnings were required. Therefore, the Court will overrule Harkins's objection, adopt the Magistrate

Judge's recommendation, and deny the Motion as it pertains to the August 1, 2019 statements.

In sum, the Court will overrule Harkins's Objection, adopt the R&R, and deny the Motion to Suppress Statements, Admissions, and Answers.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Objection to the Report and Recommendation [Docket No. 61] is **OVERRULED**;

2. The Magistrate Judge's Report and Recommendation [Docket No. 60] is **ADOPTED**; and

3. Defendant's Motion to Suppress Statements, Admissions, and Answers [Docket No. 19] is **DENIED**.

DATED:  November 30, 2021  
at Minneapolis, Minnesota.

                                                  JOHN R. TUNHEIM  
                                                  Chief Judge  
                                        United States District Court